**William V. BIDWILL; James Kensil; Michael Lynn, Individually and as members of the Retirement Board of the Bert Bell NFL Player Retirement Plan appointed by the National Football League Management Council pursuant to section 8.1(B) of the Plan, Plaintiffs–Appellants,**

**National Football League Management Council; The Five Smiths, Inc., d/b/a Atlanta Falcons; Buffalo Bills, Inc., d/b/a Buffalo Bills; Chicago Bears Football Club, Inc., d/b/a Chicago Bears; Cincinnati Bengals, Inc., d/b/a Cincinnati Bengals; Cleveland Browns, Inc., d/b/a Cleveland Browns; Dallas Cowboys Football Club, Inc., d/b/a Dallas Cowboys; PDB Sports, Ltd., d/b/a Denver Broncos; The Detroit Lions, Inc., d/b/a Detroit Lions; The Green Bay Packers, Inc., d/b/a Green Bay Packers; Houston Oilers, Inc., d/b/a Houston Oilers; Indianapolis Colts, Inc., d/b/a Indianapolis Colts; Kansas City Chiefs Football Club, Incorporated, d/b/a Kansas City Chiefs; The Los Angeles Raiders, Ltd., d/b/a Los Angeles Raiders; Los Angeles Rams Football Company, Inc., d/b/a Los Angeles Rams; Miami Dolphins, Ltd., d/b/a Miami Dolphins; Minnesota Vikings Football Club, Inc., d/b/a Minnesota Vikings; New England Patriots Football Club, Inc., d/b/a New England Patriots; The New Orleans Saints, d/b/a New Orleans Saints; New York Football Giants, Inc., d/b/a New York Giants; New York Jets Football Club, Inc., d/b/a New York Jets; The Philadelphia Eagles Football Club, Inc., d/b/a Philadelphia Eagles; Pittsburgh Steelers Sports, Inc., d/b/a Pittsburgh Steelers; Chargers Football Company, d/b/a San Diego Chargers; San Francisco Forty–Niners, Ltd., d/b/a San Francisco 49ers; Seattle Professional Football, d/b/a Seattle Seahawks; St.**

Louis Football Cardinals Co., d/b/a St. Louis Cardinals; Tampa Bay Area NFL Football, Inc., d/b/a Tampa Bay Buccaneers; Pro–Football, Inc., d/b/a Washington Redskins, Defendants–Appellants,

v.

Edward R. GARVEY; Tom Condon; Danny M. Jiggets, Individually and as members of the Retirement Board of the Bert Bell NFL Player Retirement Plan appointed by the National Football League Players Association pursuant to section 8.1(A) of the Plan, Defendants–Appellees,

and

National Football League, Defendant.

Edward R. GARVEY; Tom Condon; Danny M. Jiggets, Individually and as members of the Retirement Board of the Bert Bell NFL Player Retirement Plan appointed by the National Football League Players Association pursuant to section 8.1(A) of the Plan, Plaintiffs–Appellees,

v.

NATIONAL FOOTBALL LEAGUE, Defendant–Appellant,

and

National Football League Management Council; The Five Smiths, Inc., d/b/a Atlanta Falcons; Buffalo Bills, Inc., d/b/a Buffalo Bills; Chicago Bears Football Club, Inc., d/b/a Chicago Bears; Cincinnati Bengals, Inc., d/b/a Cincinnati Bengals; Cleveland Browns, Inc., d/b/a Cleveland Browns; Dallas Cowboys Football Club, Inc., d/b/a Dallas Cowboys; PDB Sports, Ltd., d/b/a Denver Broncos; The Detroit Lions, Inc., d/b/a Detroit Lions; The Green Bay Packers, Inc., d/b/a/ Green Bay Packers; Houston Oilers, Inc., d/b/a Houston Oilers; Indianapolis Colts, Inc., d/b/a Indianapolis Colts; Kansas City Chiefs Football Club, Inc., d/b/a Kansas City Chiefs; The Los Angeles Raiders, Ltd., d/b/a Los Angeles Raiders; Los Angeles Rams Football Company, Inc., d/b/a Los Angeles

Rams; Miami Dolphins, Ltd., d/b/a Miami Dolphins; Minnesota Vikings Football Club, Inc., d/b/a Minnesota Vikings; New England Patriots Football Club, Inc., d/b/a New England Patriots; The New Orleans Saints, d/b/a New Orleans Saints; New York Football Giants, Inc., d/b/a New York Giants; New York Jets Football Club, Inc., d/b/a New York Jets; The Philadelphia Eagles Football Club, Inc., d/b/a Philadelphia Eagles; Pittsburgh Steelers Sports, Inc., d/b/a Pittsburgh Steelers; Chargers Football Company, d/b/a San Diego Chargers; San Francisco Forty–Niners, Ltd.; Seattle Professional Football, d/b/a Seattle Seahawks; St. Louis Football Cardinals Co., d/b/a St. Louis Cardinals; Tampa Bay Area NFL Football, Inc., d/b/a Tampa Bay Buccaneers; Pro–Football, Inc., d/b/a Washington Redskins, Defendants.

Edward R. GARVEY; Tom Condon; Danny M. Jiggets, Individually and as members of the Retirement Board of the Bert Bell NFL Player Retirement Plan appointed by the National Football League Players Association pursuant to section 8.1(A) of the Plan, Plaintiffs–Appellees,

v.

NATIONAL FOOTBALL LEAGUE, Defendant–Appellant,

and

National Football League Management Council; The Five Smiths, Inc., d/b/a Atlanta Falcons; Buffalo Bills, Inc., d/b/a Buffalo Bills; Chicago Bears Football Club, Inc., d/b/a Chicago Bears; Cincinnati Bengals, Inc., d/b/a Cincinnati Bengals; Cleveland Browns, Inc., d/b/a Cleveland Browns; Dallas Cowboys Football Club, Inc., d/b/a Dallas Cowboys; PDB Sports, Ltd., d/b/a Denver Broncos; The Detroit Lions, Inc., d/b/a Detroit Lions; The Green Bay Packers, Inc., d/b/a/ Green Bay Packers; Houston Oilers, Inc., d/b/a Houston Oilers; Indianapolis

500

Colts, Inc., d/b/a Indianapolis Colts; Kansas City Chiefs Football Club, Inc., d/b/a Kansas City Chiefs; The Los Angeles Raiders, Ltd., d/b/a Los Angeles Raiders; Los Angeles Rams Football Company, Inc., d/b/a Los Angeles Rams; Miami Dolphins, Ltd., d/b/a Miami Dolphins; Minnesota Vikings Football Club, Inc., d/b/a Minnesota Vikings; New England Patriots Football Club, Inc., d/b/a New England Patriots; The New Orleans Saints, d/b/a New Orleans Saints; New York Football Giants, Inc., d/b/a New York Giants; New York Jets Football Club, Inc., d/b/a New York Jets; The Philadelphia Eagles Football Club, Inc., d/b/a Philadelphia Eagles; Pittsburgh Steelers Sports, Inc., d/b/a Pittsburgh Steelers; Chargers Football Company, d/b/a San Diego Chargers; San Francisco Forty–Niners, Ltd., d/b/a San Francisco 49ers; Seattle Professional Football, d/b/a Seattle Seahawks; St. Louis Football Cardinals Co., d/b/a St. Louis Cardinals; Tampa Bay Area NFL Football, Inc., d/b/a Tampa Bay Buccaneers; Pro–Football, Inc., d/b/a Washington Redskins, Defendants.

Nos. 91–2308 to 91–2310.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1991.

Decided Aug. 30, 1991.

As Amended Oct. 28, 1991.

See also 743 F.Supp. 393.

Lee Thomas Ellis, Jr., Baker & Hostetler, College Park, Md., argued (Jeffery Pash, Covington & Burling, Washington, D.C., Sargent Karch, Leonard H. Freiman, Douglas E. Lee, Baker & Hostetler, Washington, D.C., George Beall, Hogan & Hartson, Baltimore, Md., on the brief), for plaintiffs-appellants.

Joseph Andrew Yablonski, Yablonski, Both & Edelman, Washington, D.C., argued (Daniel B. Edelman, John F. Colwell, Yablonski, Both & Edelman, Washington, D.C., Robert V. Atmore, Luke H. Terhaar, Lindquist & Vennum, Minneapolis, Minn., on the brief), for defendants-appellees.

Before WILKINSON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and HILTON, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

This case arises from a protracted dispute among trustees of a pension plan for professional football players. The trustees chosen by the football players and those chosen by the club owners have been unable to agree on, among other things, the scope of their powers, the interpretation of their authorizing document and the amount of money the clubs owe to the pension fund. The district court held that the football clubs owed some $18 million in delinquent payments to the pension plan and additionally held liable for the same amount the trustees selected by the club owners for breaching their fiduciary duties. We agree that the clubs failed to make their full contributions but we do not believe the conduct of the trustees for the owners constituted a breach of their fiduciary obligations. We thus affirm in part and reverse in part the judgment of the district court.

## I.

This controversy revolves around the Bert Bell National Football League Player Retirement Plan, a pension and benefit trust for members of the National Football League Players Association. The Plan is structured pursuant to the Taft–Hartley Act, see 29 U.S.C. § 186(c)(5), and the Employee Retirement Income Security Act (ERISA), see 29 U.S.C. §§ 1001–1461. The Players Association selects three members of the Plan's board while the National Football League Management Council, an organization of NFL team owners, selects

another three trustees. The player trustees included a former executive director of the Players Association and two former players. The owner or management trustees included one team owner, a team president and a team executive vice president. The Commissioner of the National Football League is a seventh, but non-voting, member of the Board.

In 1982, the Players Association and Management Council negotiated a new collective bargaining agreement (CBA). The owners agreed to contribute $12.5 million to the Plan each year for five years, "provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code." The first payment was due on March 31, 1983, and the last was due on March 31, 1987. The CBA also directed the Board to set benefits at enumerated levels. Under the prior CBA, the owners' contributions to the Plan had also been set but the benefit levels were to be determined periodically by the Board to reflect prevailing conditions and actuarial predictions. When the Board first met in 1983, it adopted the preset benefit levels contained in the 1982 CBA, as well as the contribution levels.

Because the Plan's investments during the early 1980's produced greater returns than expected, the Plan became overfunded. In March 1984, the owners paid only $7.5 million into the Plan instead of the planned $12.5 million. The additional $5 million represented funds that the owners believed were not owed because they were not, in the owners' view, immediately deductible under the Internal Revenue Code due to the Plan's overfunded status. *See* 26 U.S.C. § 404(a). Because the Plan contained a nonreverter clause that made all contributions irrevocable, the owners reduced their payment in the belief that if they paid the disputed funds they would be unable to recover them at a later date.

When the Board met the following month, the player trustees moved for full payment of the $12.5 million, for authorization to institute legal proceedings against the clubs for nonpayment, for submission of a ruling request to the IRS that the full

$12.5 million was fully deductible when paid, and for an increase in benefit levels in order to eliminate the Plan's overfunded status. According to the player trustees, since the Plan referred only to "deductibility" and not to "current deductibility" and since contributions which were not immediately deductible could be carried over to future years, the full $12.5 million was due. The owner trustees agreed to seek an IRS ruling but abstained from voting on the other three motions, which consequently failed. The owner trustees stated they did not support the motions demanding payment because they had doubts that the money was actually due; they further did not support the motion to increase benefits because they believed such an action could be taken only through collective bargaining. The Board filed a request for an IRS ruling in September 1984.

In October 1984, the owners paid the Plan the disputed $5 million plus interest at 6%, the rate specified in the Plan. They did so in order to preserve under the Internal Revenue Code (IRC) their potential right to deductions but they also considered the $5 million an advance partial payment of the contribution due in March 1985. By March 1985, however, the IRS had still not ruled. The clubs initially withheld $6 million of their contributions but later paid that amount to the Plan, again preserving their rights under the IRC, and again designating the payment as an advance towards the next year's contribution. In March 1986 the clubs made no additional payments to the Plan, but promised that if the IRS ruled that all contributions were currently deductible, they would make all necessary payments plus 6% interest. At an August 1986 Board meeting the differences between the two sides remained irreconcilable. The player trustees again introduced motions demanding payment from the owners and authorizing legal action against them. The owner trustees refrained from voting until they could consult with counsel and the meeting was adjourned.

In early 1987, the IRS indicated that the $12.5 million contributions would not be fully deductible in the years they were paid. On March 5, 1987, the management

trustees filed a declaratory judgment action in the United States District Court for the District of Maryland seeking judicial interpretation of the Plan phrase "allowable as deductions." The player trustees counter-claimed, alleging that the management trustees had breached their fiduciary duties under ERISA by failing to act in the best interests of the Plan's beneficiaries. The player trustees also filed suit on behalf of the Plan against the NFL, the Management Council and the twenty-eight individual football teams for the unpaid contributions and interest.

The district court held that the phrase "allowable as deductions" contained no temporal limitations; therefore, since the IRS had ruled that the clubs could carry over excess contributions and deduct them in future years, the full $12.5 million was due each year. The court entered judgment against the clubs in the amount of $17.8 million plus double interest, attorneys' fees and costs. *See* 29 U.S.C. § 1132(g)(2). Later, the court created an escrow account into which the clubs were to pay the disputed contributions. The court did not rule on the fiduciary breach issues pending completion of discovery.

Following discovery, the district court granted summary judgment for the player trustees. The court held that the owner trustees faced inherent conflicts of interest and should have consulted outside counsel in order "to make a scrupulous and independent investigation of their options." The court later held a trial in order to determine what damages to the Plan, if any, had been caused by the management trustees' breach of duty. The evidence at trial consisted largely of expert opinions as to what actions independent counsel would have suggested and what steps a prudent trustee should have taken. The court found that the trustees did have the power under the Plan to increase benefits in an actuarially sound manner and held that the owner trustees had breached their fiduciary duties by not doing so. The effect was to hold the owner trustees liable for the same $17.8 million in unpaid contributions previously assessed against the clubs, plus 12% interest and attorneys' fees. The

court also ordered the owner trustees to increase benefits and appointed a special master to determine the extent of the increases. The court denied, however, the player trustees' other requests for permanent injunctive relief such as removing the owner trustees from the Board.

The management trustees, Management Council and football clubs now appeal.

## II.

■ The clubs first argue that the district court misconstrued the Plan to require payment of the full $12.5 million contribution each year, even when a proportion of the payment would not be deductible in the year it was paid. The controversy surrounds Section 3.2 of the Plan which reads, in part:

[T]he Employers guarantee that contributions will be paid into the Trust on or before the last day of each Plan Year, provided that such contributions are allowable as deductions under the applicable provisions of the [Internal Revenue] Code.

The clubs assert that this provision obligates them to pay only those contributions that are allowable as deductions when paid. We agree with the district court, however, that the term "allowable as deductions" contains no temporal limitation. Because under the Internal Revenue Code the clubs can carry forward any contributions not deductible in the year they are paid, the Plan requires that the full $12.5 million be paid each year.

The only condition on deductibility that appears in the language of the Plan is that contributions must be deductible under the IRC. Under 26 U.S.C. § 404(a)(1)(E), "[a]ny amount paid in a taxable year in excess of the amount deductible in such year under the foregoing limitations shall be deductible in the succeeding taxable years." Thus, the IRC provides that the full contribution can be deducted, albeit over a period of time. Because the condition of deductibility in Section 3.2 is satisfied, the contribution is plainly due. Nothing in Section 3.2 suggests that we should

read into the Plan a temporal limitation on deductibility, particularly where the sophisticated parties who negotiated its terms failed to include one. When "the principals [are] practiced and represented by counsel, and the contract itself [is] reasonably clear, it is far wiser for a court to honor the parties' words than to imply other and further promises out of thin air." *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 856 (1st Cir.1987); *see Clark v. Ryan*, 818 F.2d 1102, 1106 (4th Cir.1987).

The clubs complain that this interpretation of Section 3.2 leads to an anomalous result when combined with the nonreverter clause in Section 3.6 of the Plan. Under that clause, all payments to the Plan "shall represent irrevocable contributions and can never revert to or be enjoyed by the Employers or the League." The clubs maintain that if they are unable to use excess deductions in the future, they will never be able to recover their contributions and will have overpaid what they owed under Section 3.2.

We disagree. It is not dispositive that the clubs may be unable to use carryover deductions in the future. The Plan provision turns on whether deductions are allowable, not whether they are actually used. When the Plan is not overfunded, the full $12.5 million is unquestionably due; a given club must pay its share whether or not its financial condition permits it actually to use the corresponding deduction. For example, a football team that was losing money might be unable to claim fully its contribution as a deduction, yet it must still contribute its full share. As the clubs themselves recognize in their brief, "[a] contribution not in excess of deductible limits is allowable as a deduction regardless of whether a particular employer that must contribute to a plan enjoys a tax benefit from the deduction.... the clubs never have conditioned their contribution obligation on each club's receipt of a tax benefit." Whether a given financial expenditure is thus allowable as a deduction and whether the deduction is actually used are separate issues. It is unclear why the

question of whether the $12.5 million is due would turn on whether the clubs can actually use the deduction when the Plan is overfunded, but not in other circumstances.

Secondly, as the district court observed, if only immediately deductible contributions were owed under Section 3.2, then the need for a nonreverter clause would be diminished because the clubs would not have cause to request a refund. It may be precisely because the full $12.5 million might not be fully deductible each year that the nonreverter clause is present. We need not determine the precise purpose of Section 3.6, however, to conclude that its presence does not diminish and may strengthen the plain language in Section 3.2.

Finally the clubs argue that Section 3.2 is ambiguous and that the district court should have considered extrinsic evidence of the parties' intent. *See Southern Bell Tel. & Tel. Co. v. Florida E. Coast Ry. Co.*, 399 F.2d 854, 856 (5th Cir.1968). Even if we believed that Section 3.2 was ambiguous, there would be problems with the clubs' position. The history of Section 3.2, recited by the clubs in their brief, is not related to immediate deductibility. Rather there was a fear during the 1977 collective bargaining sessions that the Plan would lose its tax-qualified status because it had not been funded for the two previous years. Historically, then, Section 3.2 was a safety valve to protect the owners from having to make contributions to a Plan that lost its exempt status. There is no indication that the parties intended the provision to decrease promised contributions to a Plan whose tax-exempt status was not in question.

We therefore affirm the judgment of the district court that the clubs owe the Plan $17.8 million in unpaid contributions.

### III.

The owners protest that our reading of Section 3.2 will result in a continually overfunded Plan and that the parties never intended such a circumstance. That argument presumes, however, that the Board

has no power to distribute assets to the Plan's beneficiaries. In this section we discuss the Board's powers under the terms of the Plan, in particular, its ability to increase benefits. We conclude that the Board has such authority and that exercise of that power would largely resolve the problem of which the clubs complain. We believe, however, that in the absence of a fiduciary breach, it is for the trustees and not for the courts to determine the extent of any benefit increase, and we therefore vacate the district court's orders assuming those trustee prerogatives.

■ Our inquiry begins with the Plan itself. Nothing in its plain language prevents, and much appears to allow, increases in player benefits. As an initial matter, the Plan gives the trustees broad discretionary powers. Section 8.4 specifies that the Board "shall have *all* necessary powers incident to the creation, administration, implementation and operation of the Plan and Trust." (emphasis added). Section 8.13 further provides that "[w]henever in this Plan and Trust discretionary powers are given to the Retirement Board, it shall have the *broadest* discretion permitted under the Act [ERISA]." (emphasis added). This is expansive language that invests the trustees with authority to take a wide variety of actions. The initial presumption, then, is that the Board's powers include the power to increase benefits.

None of the enumerated limitations on the Board's powers change this presumption. Section 8.5 of the Plan explicitly lists a number of actions that the Board is forbidden to take. Notably absent from the Plan is any prohibition on increasing benefits. The lack of any such restriction is significant against the backdrop of the broad powers accorded the trustees. The absence of a restriction is also notable because the parties have demonstrated that where they did intend to limit the powers of the trustees, they were quite capable of doing so. Specific prohibitions were placed in Section 8.5, for example, on the trustees' ability to alter contribution levels and to decrease benefits. The absence of a similar restriction on increasing benefits must mean that no such limitation was intended.

Other parts of the Plan as well seem to indicate that the Board has the power to increase benefits. For example, Section 8.5(E) prohibits the Board from amending the Plan in a way that is actuarially unsound. Since the Board cannot change contribution levels and cannot reduce benefits, this provision must operate to guide the trustees' discretion in raising benefits. By preventing the trustees from increasing benefits beyond the Plan's capacity to fund them, the provision implies that benefit increases within the Plan's means are allowable. Also, Section 8.5(B) provides that the Board shall take no action to "cause any portion of contributions to the Plan [to] fail to be deductible to the Employers." Increasing benefits would have guaranteed deductibility to the clubs and thus finds support in this provision.

Our interpretation of the Plan is also guided by ERISA, for "trust documents must generally be construed in light of ERISA's policies." *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985); *see* 29 U.S.C. § 1104(a)(1)(D). It should be clear that ERISA was enacted to protect the interests of employees and their dependents. *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). The Act thus directs trustees to discharge their duties "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1). In order to ensure achievement of these goals, "Congress invoked the common law of trusts ... [under which] trustees are understood to have all 'such powers as are necessary or appropriate for the carrying out of the purposes of the trust.'" *Central States*, 472 U.S. at 570, 105 S.Ct. at 2840 (citing 3 A. Scott, Law of Trusts § 186 (3d ed. 1967)). Adding the Act's cardinal purpose of serving beneficiaries to the lack of any limiting language in the Plan itself, we conclude that the trustees here have the power to

increase benefits in an actuarially sound manner.

The management trustees argue, however, that by setting actual benefit levels, the 1982 CBA intended to foreclose the Board from increasing benefits under any circumstances. They point out that under the prior CBA and Plan, the trustees had the explicit power to raise benefits—a power which was nowhere expressly conferred in the 1982 agreement. They assert further that the 1982 CBA set benefit levels for the coming years in an attempt to eliminate exchanges between the trustees that had come to resemble collective bargaining; thus, to allow the Board to increase benefits would produce the same collective bargaining over benefit levels that the parties had attempted to avoid. *See United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 573–74, 102 S.Ct. 1226, 1232–33, 71 L.Ed.2d 419 (1982) (no breach of fiduciary duty in administering trust in accordance with terms of collective bargaining agreement).

We are not persuaded, however. In the first place, it is a settled principle of trust law that the powers of the trustees are determined by the terms of the trust document. *See* Restatement (Second) of Trusts § 164 (1959). As described above, we believe that document empowers the Board to raise benefits levels within the constraints imposed by the Plan.

Secondly, our holding in *Sinai Hosp. of Baltimore, Inc. v. National Benefit Fund for Hosp. & Health Care Employees,* 697 F.2d 562 (4th Cir.1982), speaks directly to the circumstances of the trustees' authority when a surplus develops in a fund, and the question arises whether that surplus will be used to reduce employer contributions, to increase employee benefits or to build fund assets by way of investment. In *Sinai Hospital,* a conflict arose between a trust fund document and collective bargaining agreements negotiated between hospital employees and a group of hospitals. Although the employees had agreed in the collective bargaining agreements that benefits were not to be raised for a three year period, the trust agreement authorized the trustees to set benefit levels. When a surplus developed in the trust fund, the trustees elected to increase benefits. This court rejected the argument that the trustees had exceeded their authority because "neither an employer nor a union, singly or together, can alter the terms of a trust instrument ... unless the power to do so was reserved when the trust was created or properly amended." *Id.* at 567.

If *Sinai* held that the trustees had not exceeded their authority in the face of an express conflict between the trust instrument and the CBA, we think it all the more apparent that they would not do so here where no conflict is present. The management trustees' argument based on the 1982 CBA is weaker here than was the hospitals' argument in *Sinai.* There, the CBA explicitly prohibited benefit increases, whereas here the CBA simply set benefit levels without reference to future increases or decreases. The 1982 CBA thus does not advance management's argument because it no more explicitly limits the trustees' power to increase benefits in an actuarially sound fashion than does the Plan. Indeed, the district court found that the parties had intended the benefit levels to be simple minimum guarantees, rather than absolute limits.

Finally, we note that if the Board had increased benefits, then the entire controversy surrounding the interpretation of "allowable as deductions" might have been avoided. The Board might have ensured that the full $12.5 million was currently deductible by increasing benefits in an actuarially sound manner in order to diminish the surplus. *See* Plan § 8.5(B) ("No action of the Retirement Board shall ... cause any portion of contributions to the Plan [to] fail to be deductible to the Employers"). The owners would have paid no more than they had agreed to in collective bargaining and would have been able to deduct the full contributions. The beneficiaries of the trust would have profited in keeping with the purposes of ERISA. Such an outcome only reinforces our conclusion that the trustees have the power to increase benefits.

■ Although we thus hold that the trustees possess the authority to raise benefits, we think it an unwarranted interference with the trustees' powers to direct the particulars of such an increase. The district court, upon holding that the management trustees breached their fiduciary duties, appointed a special master to determine what would be actuarially sound benefit increases. Because we hold in the following section that no fiduciary breaches took place, we think that course of action unwarranted.

An appointment of a special master to mandate specified benefit actions injects the courts too much in the administration of the Plan. It would be inconsistent to recognize the broad discretion accorded ERISA trustees, here including the power to raise benefits, while simultaneously removing that authority by compelling the trustees to exercise that discretion in a particular fashion. Absent a finding of a fiduciary breach, no need for a special master arises. Such an appointment would additionally move beyond *Sinai*, which held only that the trustees did not exceed their power in *choosing* to raise benefits. While the prerogative of the trustees to raise benefits is clearly established, the implementation of that prerogative properly belongs with the Plan's fiduciaries.

Therefore, although we conclude that the trustees do have the power to increase benefit levels, we vacate the district court's orders which purport to direct the specific exercise of that authority.

## IV.

■ The player trustees have urged finally that the owner trustees should be found personally liable for breaching their fiduciary duties in numerous ways. Although the owner trustees' position as to the scope of their powers has not ultimately persuaded us, we do not believe that their actions were unreasonable so as to give rise to liability. To attempt to resolve a dispute among trustees by seeking an IRS ruling and then judicial interpretation of the Plan documents was a sensible course of action that should not be penalized.

■ Trustees are charged under ERISA with a duty to discharge their responsibilities "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man … would use." 29 U.S.C. § 1104(a)(1)(B). They additionally are required to act "in accordance with the documents and instruments governing the plan." *Id.* § 1104(a)(1)(D). A trustee acts judiciously, then, in hesitantly exercising an ambiguous power. We have found nothing in the management trustees' actions that indicates they acted outside ERISA's parameters.

The initial act of seeking a ruling from the IRS was a prudent first step to resolve the conflict that had developed concerning the interpretation of the deductibility provision. The inquiry centered on the meaning of an IRC section for which the IRS had not yet issued regulations and which might have allowed the clubs to deduct the full $12.5 million each year. Had the IRS ruled the full amount currently deductible, a large part of the dispute would have been resolved. The Board voted to pursue this course of action with the knowledge that the clubs would pay any amount ultimately found owing to the Plan. The trustees also knew that the NFL Management Council had agreed to extend all time limitations on grievances until after the IRS ruled. Additionally, the trustees knew the Plan was in no danger of being underfunded; the Plan's significantly overfunded status was the root of the controversy. The player trustees have further made no claim that a single promised benefit was withheld. Finally, a review of the transcript of the Board's August 18, 1984 meeting reveals that the player trustees were the group more confident that the IRS ruling would resolve the conflict. In such circumstances they should not be heard to argue that the management trustees breached a duty by failing to take more drastic action at that time.

When the IRS ruling did not resolve the issue of how much money was due the Plan, the owner trustees sought a declara-

tory judgment on that very point. Rather than immediately commencing lawsuits demanding payment from each of the clubs, they chose to determine first whether the clubs actually owed the money to the Plan. They agreed at Board meetings with the player trustees that if the money was owed, then the Board had a duty to obtain it. *See Kim v. Fujikawa*, 827 F.2d 1401, 1404 (9th Cir.1987). We cannot imagine that seeking first to ascertain the extent of the owners' possible underpayment would subject the trustees to personal liability. If the money had not been owed, then further collection actions would have been an inappropriate use of the Plan's resources. *See McMahon v. McDowell*, 794 F.2d 100, 110 (3d Cir.1986) (no breach of fiduciary duty for refraining from bringing an imprudent action).

Nor was failing to increase benefits an error punishable by personal liability. A trustee who was aware of the 1982 collective bargaining sessions and the modification of the Plan to delete the authorization to raise benefits might well have concluded that the Board had no power to raise benefits and that it had no business doing so. We disagree with that conclusion, but our opinion should not be read to preclude the possibility of a prudent trustee believing otherwise. Furthermore, the Plan granted the trustees the power to define and interpret its terms. *See* Plan § 8.4(A). When the governing document explicitly grants such authority, some deference is owed to trustees' interpretation of that document and their powers under it. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989).

The player trustees argue, however, that the management trustees should be held liable because ERISA strictly prohibits conflicts of interest. *See* 29 U.S.C. § 1106(b)(1). "A fiduciary cannot contend 'that, although he had conflicting interests, he served his [several] masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *NLRB v. Amax Coal Co.*, 453 U.S. 322, 330, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981) (quoting *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct.

493, 497, 85 L.Ed. 820 (1941)). Thus they assert that the owner trustees should be liable because the clubs they worked for stood to benefit by $600,000–$700,000 each if the contributions were not pursued. In support of this position, the player trustees also point to a Department of Labor Opinion which concludes that a trustee of a Taft–Hartley plan who is an affiliate of a delinquent employer and who participates in a decision to defer a delinquent employer contribution engages in a prohibited transaction under ERISA. Dept. of Labor, Pension & Welfare Benefit Programs, Op. 77–91 (April 22, 1977).

This argument is misleading, however. ERISA explicitly permits someone to serve "as a fiduciary" who is also "an officer, employee, agent, or other representative of a party in interest." 29 U.S.C. § 1108(c)(3). This circuit has already rejected the idea that fiduciaries under ERISA cannot be impartial simply because they have ties to contributors to the plan. *See De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191–92 (4th Cir.1989). Moreover, although the existence of a conflict of interest may have relevance to the analysis, it is but one factor to be weighed in determining whether trustees have abused their discretion. *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956; Restatement (Second) of Trusts § 187 comment d (1959). We conclude that this factor does not outweigh the other considerations present here.

The second problem with the player trustees' argument is that it presumes that the funds were due and owing when that issue was precisely what the dispute concerned. The owner trustees agreed with the player trustees that if contributions were owed, the Board had the duty to obtain them. As discussed above, the owner trustees took reasonable steps to resolve the conflict and to determine the clubs' potential liability. This simply is not a case where fiduciaries attempted to write off a clearly owed debt in order to profit themselves.

■ The player trustees finally argue that the owner trustees breached their fi-

duciary duties by failing to consult outside counsel when confronted with a conflict of interest. Although the owner trustees did consult an attorney, the player trustees take issue with the fact that the particular attorney represented the NFL Management Council as well as the Plan. The district court agreed with that view and imposed a duty to consult independent counsel. *See also McMahon v. McDowell,* 794 F.2d 100, 110 (3d Cir.1986) (fiduciary may have duty "to seek the guidance of a neutral third party").

We do not believe the owner trustees violated any fiduciary duties by relying upon an attorney who was also co-counsel for the Plan, however. Nothing in ERISA explicitly requires that outside counsel invariably be consulted. Indeed, ERISA specifically allows individuals with close ties to employers to serve as trustees. *See* 29 U.S.C. § 1108(c)(3). Had Congress intended that such people be allowed to serve as trustees only on the condition that they consult outside counsel, it would have been a simple task to have said so. The Third Circuit also reached this conclusion in *Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan,* 854 F.2d 1516, 1531–32 (3d Cir.1988). In *Ashenbaugh,* the board of the pension plan was composed solely of officers of the employer and was advised by the employer's counsel. *Id.* at 1519 & n. 2. The court refused to impose a duty to hire independent counsel to help the committee interpret and administer the plan. Here, where the nature of the conflict of interest is precisely that already allowed by ERISA and where the trustees have acted prudently, we decline to find a breach of fiduciary duty by failing to consult outside counsel.

The owner trustees acted cautiously and in hopes of avoiding fruitless litigation. We believe they acted properly in seeking a ruling from the IRS followed by a judicial declaration of the meaning of the Plan. Because they reasonably discharged their fiduciary duties under ERISA, we reverse the district court's holding that those duties were violated.

### V.

To summarize, we hold that the full $12.5 million contribution was due each year under the terms of the Plan. We further hold that it is within the trustees' powers to raise benefits under the Plan in an actuarially sound manner. Finally, we believe the owner trustees did not proceed in disregard of their fiduciary duties. The judgment of the district court is therefore

AFFIRMED IN PART, REVERSED IN PART.