Robert Q. ALIFF, et al.

v.

BP AMERICA, INC., et al.

Civ. A. No. 3:92–0387.

United States District Court,
S.D. West Virginia,
Huntington Division.

July 2, 1993.

---

H. Truman Chafin, Gretchen Lewis Chafin, Williamson, WV, for plaintiffs Robert Q. Aliff, Michael R. Blackburn, Roger L. Blankenship, James A. Bowers, Jr., Clifton W. Brown, Daniel J. Casey, James M. Charles, Jerry D. Cisco, Jerry M. Cisco, Trellis H. Cisco, Harold Coleman, Irvin C. Dean, Eddie M. Dillon, James W. Donahoe, Peter R. Eisenman, Clifton L. Frye, Ward Gartin, George E. Hager, Oliver Harris, Jr., John Hatfield, John R. Hill, Joseph H. Ibos, Ronald L. Kennedy, Donald Mahon, Ronald Mahon, Paul D. Matney, Randall E. May, James A. Maynard, Rhonda R. Maynard, Robert R. McClanahan, Thomas E. Moore, James M. Osborne, Wallace Perry, Gilbert W. Rowe, Dallas T. Runyon, Tommy L. Sammons, Charles E. Slone, Charles D. Smith, Larry S. Smith, Lora J. Stuart, Roger L. Swiney, Darlene Varney, James M. Wesley.

Charles M. Surber, Jr., Michael D. Foster, Jackson & Kelly, Charleston, WV, Joseph T. Dattilo, BP America, Inc., Cleveland, OH, BP America Inc., a Del. Corp., BP America Inc., and D.R. Duckworth, in his personal capacity and in his capacity as Plan Administrator of that certain ERISA employee welfare benefit plan described herein, That Certain ERISA Employee Welfare Benefit Plan Described Herein and Referred to as the BP America Inc. Involuntary Separation Program in the Plan Documents and BP Coal Inc., a Del. Corp.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the Defendants' motion for summary judgment. For reasons discussed

below, the Court **GRANTS** the motion and resolves the case.

Under *Rule 56(c)* of the Federal Rules of Civil Procedure, summary judgment is proper only:

"[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). If the moving party meets its initial burden, the burden then shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must offer evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Based on this standard the Court is of the opinion there are no genuine factual issues for trial.

On July 20, 1990, BP America, Inc., the sole shareholder of Old Ben Coal Company, sold all its stock in Old Ben to Zeigler Coal Holding Company. The Plaintiffs were employed by Old Ben during BP's ownership, and all continued working for Old Ben during Zeigler's ownership.[1]

Prior to this sale BP adopted the Involuntary Separation Program ("ISP") for employees of Old Ben Coal. The ISP is an employee welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1002(1) and 1002(2)(B). The Plaintiffs seek severance benefits associated with Old Ben's sale.

Section II of the ISP provides that a non-union, salaried employee may recover severance benefits if: 1) he is "displaced" by the company due to the sale of its coal operations, meaning the employee remained with the selling Company up until the closing date; and 2) the employee "continue[s] employment with the Buyer in a job which is not at an equivalent level of total compensation to ... [the employee's job] with the Company immediately prior to the Closing date and resign[s] within thirty (30) days following the Closing Date." Section II(b) states that an employee "may request an advance determination of ... [his] eligibility" under the program.

Under the ISP, the plan administrator or his designee determines whether an employee receives an "equivalent level of total compensation" based on "the estimated aggregate value of base pay, incentive compensation, savings plan, pension, medical, dental, life insurance, short term disability, and long term disability." Section II states the plan administrator has "sole and exclusive discretion and authority to apply, construe, and interpret this provision of the Program and make such determination of equivalent level of total compensation," and that his determination is "final and binding."

On July 23, 1990, the plan administrator notified the Plaintiffs of his decision to deny severance benefits. The notification letter from designee Administrator P.S. McAuliffe states the following:

"Based upon a review of the applicable BP America and Zeigler employee benefits

---

1. The Court notes that one of the Plaintiffs, Robert Aliff, voluntarily resigned from Old Ben during the twelve months following the company's sale to Zeigler Coal. Section II(d) of the ISP states that a displaced employee is eligible for severance benefits if he "continue[s] employment with the Buyer and that employment is *ended by the Buyer* within twelve (12) months of the Closing Date." emphasis added. Because Aliff voluntarily resigned employment, rather than having his employment terminated by Zeigler, the Defendants assert this provision is irrelevant. The Plaintiffs do not contest this issue and the Court concludes that Section II(d) of the ISP is inapplicable to support Aliff's legal position. The Court notes that of the 43 Plaintiffs, 41 remain actively employed by Old Ben. The other two Plaintiffs, including Robert Aliff, voluntarily resigned.

programs, it has been determined that, in the aggregate, they are substantially equivalent. Accordingly, this last provision would potentially apply to employees transferring to Zeigler only if their base salary (or executive bonus target, where applicable) is reduced from the level in effect at the close."

A copy of the ISP plan was enclosed with the letter. McAuliffe also prepared an internal memorandum, dated July 23, which outlined the reasons for his decision. This memorandum compares the medical, welfare, pension, and savings/incentive plans for BP America and Zeigler Coal.[2]

On August 8, 1990, each Plaintiff wrote the plan administrator protesting the decision to deny severance benefits. A representative letter from Plaintiff Paul Matney asks the administrator to "[p]lease review the two benefit programs and advise in writing how the determination of equivalency was made and who made that determination." On August 20, 1990 the plan administrator responded, stating that the programs were "substantially equivalent" based on the sale agreement, a comparison of benefit plans, and advice from actuarial consultants. The administrator stated that "[t]he determination was made on an aggregate basis, rather than on an application of each plan's provisions to individual employees." On August 28, 1990, the Plaintiffs requested copies of the pertinent actuarial report, which McAuliffe later denied by letter dated November 5, 1990.

In comparing benefit plans the plan administrator relied partially on a report prepared for it by an actuary, Kwasha Lipton. The report concluded that the primary difference in benefit plans concerned BP's savings plan versus Zeigler's incentive based program (the "ZIP" program). Under BP's plan, the company guaranteed a matching contribution of up to six percent (6%) of an employee's savings. Zeigler had no such savings plan, instead utilizing the "ZIP" incentive program. In the two years prior to Old Ben's sale the ZIP plan provided bonuses of nearly twelve percent (12%) of base pay. The Kwasha Lipton report summarized benefits as follows:

"It appears that the biggest obstacle to the comparability requirement is the discretionary nature of Zeigler's ZIP contribution. Some type of commitment or guar-

---

**2.** The memorandum provides in relevant part as follows:

"[W]e have determined that the estimated values of the applicable benefit programs, in the aggregate, are substantially equivalent.

"Key factors in the evaluation of benefits programs are as follows:

* The Zeigler medical program is superior to the BP America Program. It provides equivalent coverages but with no required employee contribution; it provides a lower stop-loss; and has more lenient cost containment provisions.

* Differences in other welfare programs are relatively minor and are offsetting, depending upon an employee's pay level; as a result, they do not have a significant impact upon the comparability analysis.

* Overall, the Zeigler pension plan formula provides a retirement benefit comparable to the BP America pension plan formula. The Zeigler pension program provides accruals for future service that result in a more favorable retirement benefit than that provided by the BP America plan formula for a similar period. In addition, the agreement recognizes past service for vesting, and only counts future service with Zeigler towards the 25 year service cap in the Zeigler plan. Furthermore, it is likely that improvements in the current Social Security

offset provision will be adopted to comply with new pension plan nondiscrimination rules, further improving the benefit for lower-paid employees. While there are some circumstances in which an individual's benefit with Zeigler could be lower, on balance the plans are considered comparable.

* The Zeigler savings plan does not have a matching provision comparable to the 6% match under the BP America plan. Instead, Zeigler sponsors a broad-based Employee Incentive Plan (ZIP) that provides cash bonus payments, tied to cost saving objectives. Over the past two years, actual payouts for office and management staff have averaged 11.7% of base pay, and there is no formal cap on plan payout levels. Payout at these levels are not assured; however, the sales agreement reflects an intent by Zeigler management to maintain the opportunity for substantial payout levels in order to assure that its benefit programs are "substantially comparable in the aggregate" to BP America's. In addition, Zeigler management has acknowledged the need to continue the opportunity for substantial payout levels in order to maintain favorable employee perception of the overall program. While there is no guarantee of future payout levels, the most recent performance of the plan has produced greater compensation value than the BP America plan."

antee from Zeigler that this contribution would not fall below 6% would alleviate this problem. Absent that additional level of comfort the comparison really becomes a subjective one: is a discretionary contribution that happens to have been close to 12% of pay in recent years comparable to a "guaranteed" contribution of 6% of pay?"

In addition to the actuarial report, the plan administrator relied on Section 11 of the stock sales agreement. Section 11(B)(1) provides as follows:

"[Continuing employees] shall be eligible as of the Closing Date to participate in Buyer's retirement (including savings), medical ... and dental, disability and other employee benefit plans programs and policies ... in accordance with the eligibility rules thereunder, which Plans are intended to be *substantially comparable in the aggregate* to the employee benefit plans, programs and policies of Seller...." (emphasis added).

Based on the actuarial report, the sales agreement, and the benefit plans, Defendants claim the administrator properly denied benefits after concluding Plaintiffs received an "equivalent level of total compensation" in their employment with Zeigler Coal. The Plaintiffs assert compensation is not equivalent, and rely primarily on the expert opinion of Frederick Kilbourne, their actuary. The Plaintiffs also claim the plan administrator improperly failed to compare total compensation of individual employees before and after

the sale, and that Kwasha Lipton incorrectly evaluated total compensation on a "substantially comparable" standard, rather than by the ISP's "equivalence" standard.

Lastly, Plaintiffs assert the plan administrator and Kwasha Lipton were biased, citing the following: 1) P.S. McAuliffe's "long-time" employment with BP, 2) Kwasha Lipton's "$1,000,000 a year" services for BP, 3) the plan administrator's stock ownership in BP, 4) the absence of reserved funds for the payment of ISP benefits, 5) McAuliffe's consultations with his BP staff and BP's in-house counsel, and 6) McAuliffe's failure to seek independent expert advice. The Plaintiffs also refer to selected statements from McAuliffe's deposition, in which McAuliffe states "the company" was making the determination of eligibility. (pp. 72 and 74 of McAuliffe's deposition).[3]

The complaint asserts nine claims for relief. Claims one through five consist respectively of common law actions for fraud, concealment, constructive fraud, nondisclosure fraud, and breach of contract. The sixth claim is an ERISA action for benefits arising under an employee welfare benefit plan. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). The seventh claim is an ERISA action for fiduciary breach. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). The eighth "claim" seeks injunctive relief under ERISA, more properly includable in the prayer for relief. ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3). Lastly, the ninth claim is

---

**3.** Relevant language from McAuliffe's deposition states the following:

"Q. You did not ask [Kwasha Lipton] for an interpretation of the sales agreement?
A. I think for a final interpretation. It was really reviewing it, they were advising us but *the company was making the final determination.*
Q. And when you say the company was making the final determination, that would be you, would it not?
A. Yes, it would.

. . . . .

Q. Did you notice when you read it that Kwasha Lipton did not draw conclusions?
A. Yes, I did. And that was consistent with the request that they provide advice, but it was *the company that would be drawing the final conclusion.*" (pp. 72 and 74 of McAuliffe's deposition) (emphasis added).

The Court notes that following these statements McAuliffe clarified his understanding of the plan administrator's role:

"Q. So you're saying that the decision as to when one company's benefits are equivalent to another company's benefits is a discretionary decision that is made within BP?
A. That's not what I said. What I think is that the interpretation of both the sales agreement and the involuntary separation plan was a discretionary decision *with the plan administrator and with me as the plan administrator's designee.*

We were using support advisors [i.e. Kwasha Lipton] to assist us in that decision, but we were not delegating to them responsibility to actually make the final determination of eligibility, but rather to advise me and my staff on how to interpret the sales agreement and the ISP." (pp. 74–75 of McAuliffe's deposition) (emphasis added).

an ERISA claim based on the plan administrator's refusal to provide requested information to a plan participant or beneficiary. ERISA § 502(c), 29 U.S.C. § 1132(c).

## COMMON LAW CLAIMS

 The first issue is whether the state claims are preempted by ERISA. The relevant ERISA statute states the following:

"Except as provided in subsection (b) of this section [the saving clause], the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan...." ERISA § 514(a), 29 U.S.C. § 1144(a) (emphasis added).

State law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). Thus ERISA § 514(a) must be given broad effect because of what the Court of Appeals of this Circuit has characterized as "the unparalleled breadth of ERISA's preemption provision." *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1147 (4th Cir.1985).

In *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court addressed ERISA preemption of state common law claims. In *Pilot Life* the Plaintiff injured his back in an employment related accident. Following a dispute over disability coverage, the Plaintiff sued Pilot Life Insurance for tortious breach of contract, breach of fiduciary duties, and fraud in the inducement. The Supreme Court held ERISA preempted the common law claims:

"In particular we have emphasized that the preemption clause is not limited to "state laws specifically designed to affect employee benefit plans." The common law causes of action raised in Dedeaux's complaint, each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under § 514(a)." *Id.* at 47–48, 107 S.Ct. at 1552–1553 (citation omitted).

The Fourth Circuit has also addressed ERISA preemption of common law actions. In *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140 (4th Cir.1985), Burlington sold certain company divisions to Kayser–Roth Corporation. Employees of the sold divisions continued working for Kayser–Roth. These employees subsequently brought suit for severance benefits under ERISA, also suing for breach of contract and estoppel. The Court held:

"Preemption applies to a state cause of action under common law as well, for the state breach of contract and estoppel claims pose the same potential as the statutory cause of action for conflicting employer obligations and variable standards of recovery. As in *Gilbert [v. Burlington Industries, Inc.,* 765 F.2d 320 (2nd Cir. 1985) ], "the state law claims ... would determine whether any benefits are paid, and directly affect the administration of benefits under the plan." " *Id.* at 1147 (citation omitted).

This Court similarly held that § 514(a) preempts state law contract and tort actions for benefits under employee welfare benefit plans. *Southern v. Emery Worldwide,* 788 F.Supp. 894, 896 (S.D.W.Va.1992). The Fifth and Eleventh Circuits likewise have applied § 514 preemption to state law claims for breach of contract, fraud, and negligent misrepresentation. *Memorial Hospital System v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir.1990); *Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1470 (11th Cir.1986).

State law actions, however, are not preempted invariably by § 514. In *Pizlo v. Bethlehem Steel Corp.,* 884 F.2d 116 (4th Cir.1989), the plaintiffs brought state claims for breach of contract, promissory estoppel, and negligent misrepresentation. Plaintiffs alleged they were wrongfully terminated after an oral employment contract with the Defendants. The Court refused to apply preemption under § 514, stating the following:

"The [state law] claims do not bring into question *whether Plaintiffs are eligible for plan benefits, but whether they were wrongfully terminated from employment* after an alleged oral contract of employ-

ment for a term. In their state law claims, the Plaintiffs seek from the corporation compensatory damages for wages and pension, health, life and disability benefits that they would have been entitled to *had the alleged contract to work until age 62 not been breached.*" *Id.* at 120 (emphasis added).

■ Construing these rulings, the Court concludes that Plaintiffs' claims one through five are preempted by § 514(a) of ERISA. This action resembles *Pilot Life* and *Holland* in that all state based claims involve the administrator's denial of severance benefits. The claims for fraud, concealment, constructive fraud, and nondisclosure fraud charge "false and misleading representations," concealment of material information, and nondisclosure of pertinent facts *with respect to the administrator's determination of ISP eligibility.* The claim for breach of contract asserts the Defendants wrongfully failed to provide "British Petroleum benefits [under the ISP] . . . until such time as such employment was properly terminated. . . ." These claims all "relate to" and "reference" the ISP benefits plan.

Unlike the *Pizlo* case, which primarily involved an action for wrongful termination, this case clearly arises from the plan administrator's determination of ISP eligibility to those who continued their employment with Old Ben's successor owner. Applying the decision in *Pilot Life,* Plaintiffs' common law claims are "based on alleged improper processing of a claim for benefits under an employee benefit plan," and therefore are preempted by ERISA.

### ERISA CLAIMS

### I. ERISA CLAIM FOR SEVERANCE BENEFITS

Plaintiffs' sixth claim for relief seeks severance benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Section 502(a)(1)(B) states the following:

"A civil action may be brought by a participant or beneficiary [of an employee benefit plan] to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

■ In reviewing a denial of benefits challenged under § 502(a)(1)(B), the court must apply a "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–957, 103 L.Ed.2d 80 (1989). If the administrator has discretionary authority, then a deferential "abuse of discretion" standard applies, and the denial of benefits "will not be disturbed if reasonable." *Id.* at 111, 115, 109 S.Ct. at 954, 956–957; *De Nobel v. Vitro Corp.,* 885 F.2d 1180, 1186–87 (4th Cir.1989). Under the deferential standard, reviewing courts may disturb the administrator's ruling "only upon a showing of procedural or substantive abuse." *De Nobel v. Vitro Corp.,* 885 F.2d at 1186.

■ The challenged ISP is an integral part of the benefit plan. It gives the plan administrator "sole and exclusive discretion and authority to apply, construe, and interpret this provision of the Program and make such determination of equivalent level of total compensation." An abuse of discretion standard is appropriate therefore in reviewing Plaintiffs' ERISA claim. In accordance with *Bruch* and *De Nobel,* McAuliffe's denial of benefits must be upheld if "reasonable," and if there is no "procedural or substantive abuse."

■ In determining whether there was an abuse of discretion, a reviewing court must consider whether the administrator or fiduciary may have had a conflict of interest. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–957; *De Nobel v. Vitro Corp.,* 885 F.2d at 1191; *Bidwill v. Garvey,* 943 F.2d 498, 508 (4th Cir.1991). Nevertheless, "athough the existence of a conflict of interest may have relevance to the analysis, *it is but one factor to be weighed in determining whether trustees have abused their discretion.*" *Bidwill v. Garvey,* 943 F.2d at 508 (emphasis added).

■ ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), permits an officer, employee or other representative of a party in interest to serve as a fiduciary. The Fourth Circuit has "rejected the idea that fiduciaries under ERISA cannot be impartial simply because they have ties to contributors to the plan." *Bidwill v. Garvey*, 943 F.2d 498, 508. The *Bidwill* case also addressed the issue of outside counsel and held:

> "We do not believe the owner trustees violated any fiduciary duties by relying upon an attorney who was also co-counsel for the Plan, however. Nothing in ERISA explicitly requires that outside counsel invariably be consulted. Indeed, ERISA specifically allows individuals with close ties to employers to serve as trustees. *See* 29 U.S.C. § 1108(c)(3).
>
> . . . . .
>
> Here, where the nature of the conflict of interest is precisely that already allowed by ERISA and where the trustees have acted prudently, we decline to find a breach of fiduciary duty by failing to consult outside counsel." *Id.* at 509.

After reviewing the ISP, the Kwasha Lipton report, and the detailed findings of the July 23 memorandum (see footnote two), the Court concludes that designee Administrator McAuliffe exercised "reasonable" discretion in denying severance benefits. Based on the Kwasha Lipton report, McAuliffe concluded the primary difference in benefit programs involved BP's "matched" savings plan and Zeigler's "ZIP" incentive program. McAuliffe reasonably found that a variable twelve percent (12%) return under the ZIP plan was at least equivalent to a guaranteed six percent (6%) return under BP's savings plan. The July 23 memorandum provided detailed comparisons of the various benefit plans, and is demonstrable support for the conclusion that McAuliffe carefully considered the "estimated aggregate value of base pay, incentive compensation, savings plan, pension, medical, dental, life insurance, short term disability, and long term disability," in compliance with Section II(b) of the ISP.

■ The Court has considered the conflicts of interest issue raised by the Plaintiffs, and concludes that any such conflict is outweighed by McAuliffe's reasonable reliance on Kwasha Lipton's expert opinion, and by the detailed findings in McAuliffe's July 23 memorandum. As stated in *Bidwill*, a conflict of interest "is but one factor to be weighed in determining whether trustees have abused their discretion." Applying *Bidwill*, the Court recognizes a company officer may function impartially as plan administrator, and plan administrators may rely on in-house counsel without breaching fiduciary obligations.

■ The Plaintiffs also claim the Kwasha Lipton report improperly compared benefits on a "substantially comparable" standard rather than the ISP's "equivalent level of total compensation" standard. As discussed above, the ISP defines "equivalent level of total compensation" as the "estimated aggregate value" of base pay and benefits. The Court believes a "substantially comparable" standard adequately observes the ISP's command for an "equivalent level of total compensation."

■ Lastly, the Plaintiffs claim the ISP specifically required McAuliffe to compare each individual employee's total compensation before and after the sale. The Court disagrees. Because the language of the ISP does not mandate an employee by employee analysis, McAuliffe exercised reasonable discretion in comparing aggregate compensation for all employees, rather than for each individual employee. The Court notes also that Plaintiffs were provided with an "advance determination" of McAuliffe's findings on July 23 and August 20, 1990, in compliance with Section II(b) of the ISP.

■ Plaintiffs' claim for ERISA benefits also fails on another ground. Section II(b) of the ISP provides benefits for "displaced" employees who "continue employment with the Buyer in a job which is not at an equivalent level of total compensation … *and* resign within thirty (30) days following the Closing Date." As previously noted, all Plaintiffs continued working for Old Ben after the sale to Zeigler, and none resigned within thirty

(30) days following the sale closing date of July 20, 1990.[4]

Plaintiffs therefore fail to meet either the "equivalence" or "time" requirements of Section II(b), and the claim for severance benefits must be dismissed on this basis as well.

The Court also gives weight to the rationale for the decision of *Sejman v. Warner–Lambert Co., Inc.,* 889 F.2d 1346 (4th Cir. 1989). In the *Sejman* case, Warner–Lambert sold its Medical–Surgical Division to Professional Medical Products, Inc. (PMP). The Plaintiffs were employees of the sold division, and continued working for PMP following the change in ownership. The Court refused to award the Plaintiffs severance benefits, stating the following:

> "Further, as the district court noted, payment from Warner–Lambert would be the equivalent of a windfall recovery for plaintiffs who are covered by their present employer's severance policy. In the case of the Sejman plaintiffs, supplementing their salary checks from PMP with severance payments from Warner–Lambert would seem even more of a windfall, because it would award severance pay to persons who *never changed jobs and were never out of work."* *Id.* at 1350 (emphasis added).

Similar to the *Sejman* case, 41 of the 43 Plaintiffs remain employed by *Old Ben.*[5] An award of severance benefits likewise would provide a windfall for persons "who never changed jobs and were never out of work."

## II. ERISA CLAIM BREACH OF FIDUCIARY DUTY

█ The seventh claim for relief asserts a breach of fiduciary duty under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Under § 502(a)(2), a participant, beneficiary, or fiduciary of an employee benefit plan may seek relief under ERISA § 409, 29 U.S.C. § 1109. Section 409(a) provides as follows:

> "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to

such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which would have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

The Plaintiffs' complaint seeks the following relief with respect to fiduciary breach:

1) recovery of plan benefits, enforcement of plan rights, and a declaration of future plan rights;

2) injunctive relief prohibiting the acts complained of; and

3) a judgment in favor of the Plaintiff and "in favor of the Plan" allowing recovery of extracontractual damages and punitive damages.

In *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985), the Supreme Court held that beneficiaries may bring a § 409 action on behalf of a benefits plan, but not on behalf of themselves personally:

> "Thus, there really is nothing at all in the statutory text [of ERISA § 502] to support the conclusion that such a delay [in the processing of benefit claims] gives rise to a private right of action for compensatory or punitive relief. And the entire text of § 409 persuades us that Congress did not intend that section to authorize any relief *except for the plan itself."* *Id.* at 144, 105 S.Ct. at 3091 (emphasis added).

The Court ruled that "the relevant text of ERISA, the structure of the entire statute, and its legislative history all support the conclusion that in § 409(a) Congress did not provide, and did not intend the judiciary to imply, a cause of action for extracontractual damages caused by improper or untimely processing of benefit claims." *Id.* at 148, 105 S.Ct. at 3093. The Court of Appeals for this Circuit has refused to permit extracontractual or punitive damages in actions under § 502(a). *Reinking v. Philadelphia Ameri-*

---

4. The Plaintiffs do not dispute this.

5. See Footnote 1, *supra.*

*can Life Ins. Co.,* 910 F.2d 1210, 1219–20 (4th Cir.1990); *Powell v. Potomac Telephone Co. of Virginia,* 780 F.2d 419, 424 (4th Cir.1985); *Accord Abels v. Kaiser Aluminum & Chemical Corp.,* 803 F.Supp. 1151, 1152–1153 (S.D.W.Va.1992).

Based on the above decisions, the Court concludes that Plaintiffs have no private right of action for declaratory, injunctive, or damages relief under ERISA § 409(a). Section 409(a) authorizes relief only "for the plan itself," and Plaintiffs may not seek relief for themselves as plan beneficiaries.

■ The Court also concludes that Plaintiffs may not recover extracontractual and punitive damages "in favor of the Plan." Based on the *Russell* decision and Fourth Circuit rulings, the Court does not believe §§ 502(a) and 409(a) permit recovery of extracontractual or punitive relief in any event. The Court therefore grants summary judgment on the seventh claim for fiduciary breach.

■ The ninth claim for relief asserts an ERISA violation of 29 U.S.C. § 1132(c), which provides as follows:

"Any administrator who fails to comply with a request for any information which such administrator *is required by this subchapter to furnish* to a participant or beneficiary ... may in the court's discretion be personally liable to such participant or beneficiary." (emphasis added).

The Plaintiffs claim the plan administrator violated § 1132(c) by failing to provide them with a copy of the Kwasha Lipton actuarial report.

Under 29 U.S.C. § 1024(b)(4), upon written request of a beneficiary the plan administrator must "furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." This statute does not require the plan administrator to supply a copy of the pertinent actuarial report. The Court also notes that Plaintiffs were provided with a copy of the ISP, the document "under which the [severance] plan ... [was] established or operated." Plaintiffs therefore have no cause of action under 29 U.S.C. § 1132(c).

Accordingly the Court **GRANTS** summary judgment on all claims and **ORDERS** that this action be dismissed with prejudice from the docket.